PFIZER INC., Plaintiff,

v.

**F & S ALLOYS AND MINERALS CORPORATION, Defendant.**

No. 93 Civ. 7160 (MEL).

United States District Court,
S.D. New York.

July 1, 1994.

---

Dennis J. Mondolino, and Richard E. Parke, Hopgood, Calimafde, Kalil & Judlowe, New York City, for plaintiff.

Darby & Darby, P.C., New York City, for defendant; David R. Francescani and Joseph R. Robinson, of counsel.

LASKER, District Judge.

Pfizer Inc., a domestic manufacturer of pharmaceutical products and chemicals, owns United States Patent No. 4,028,717 (issued April 4, 1978), which claims a process for the manufacture of the flavor enhancers maltol and ethyl maltol. Pfizer has been the exclusive producer of maltol in the United States for the past 15 years. The Pfizer patent expires in April 1995.

In 1988, Congress amended the patent statutes to prohibit the unauthorized importation, sale or use of an infringing product manufactured abroad. 35 U.S.C. § 271(g) (1994) states in relevant part:

> Whoever without authority imports into the United States or sells or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, sale, or use of the product occurs during the term of such process patent.

In October 1993, Pfizer filed this suit under § 271(g) against Anhui Hefei Flavour Factory ("Anhui"), a manufacturer of maltol and ethyl maltol in the People's Republic of China, and domestic corporations that import Anhui's maltol into the United States—Aceto Corporation and F & S Alloys and Minerals Corporation ("F & S"). For some months, Pfizer attempted to engage Anhui in discovery to ascertain the precise process used by Anhui to manufacture maltol and ethyl maltol. Anhui resisted discovery except to state in letters to Pfizer that its process did not infringe Pfizer's patent.

In January 1994, Aceto Corporation was dismissed from the suit. In May 1994, Anhui moved to dismiss the lawsuit against it on the grounds that its actions did not fall within the purview of § 271(g) and for lack of personal jurisdiction, and its motion was supported by F & S. On May 20, 1994, the motion was granted on a finding that § 271(g) does not apply to a foreign manufacturer who does not itself import the allegedly infringing product into the United States.

Pfizer's infringement case against the only remaining defendant, F & S, was tried to the bench.

## I.

### BURDEN OF PROOF

In a companion statute, Congress set out the burdens of proof for claims brought under § 271(g):

> In actions alleging infringement of a process patent based on the importation, sale, or use of a product which is made from a process patented in the United States, if the court finds—

> (1) that a substantial likelihood exists that the product was made by the patented process, and

> (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made.

35 U.S.C. § 295 (1994).

Applied to this case, the statute requires that initially Pfizer must establish by a preponderance of the evidence that there is a substantial likelihood that Anhui uses Pfizer's patented process to manufacture maltol and ethyl maltol and that Pfizer has made a reasonable effort to determine the actual process used by Anhui but was unable to do so. If Pfizer meets that burden, the Anhui process is presumed to infringe Pfizer's patent and the burden shifts to F & S to establish that the Anhui process does not infringe.

## II.

### THE PATENT

Patent No. 4,082,717 describes a one-pot two-step process of creating synthetic maltol and ethyl maltol (Pl.Ex. 20). Maltol and ethyl maltol are flavor and aroma enhancers added to foods and perfumes. Pfizer's patented process begins with furfuryl alcohol that is treated with a halogen oxidant such as chlorine or bromine, causing the reaction mixture to form an intermediate known as 4–halo–dihydropyran (step 1), which is transformed into pyromeconic acid by the presence of water and the application of heat (step 2). In one variant of the process, methyl furfuryl alcohol is used as the starting compound to form maltol; in another variant, ethyl furfuryl alcohol is the starting point, yielding ethyl maltol (Pl.Ex. 33).

Pfizer contends that its patent for synthesizing maltol constitutes a "pioneer patent" because it represents a major improvement from prior processes. A pioneer patent is "a patent covering a function never before per-

formed, a wholly novel device, or one of such novelty and importance as to mark a distinct step in the progress of the art, as distinguished from a mere improvement or perfection of what had gone before." *Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537, 561–562, 18 S.Ct. 707, 718, 42 L.Ed. 1136 (1898). Pfizer considers its patent revolutionary in that: (1) it uses inexpensive ingredients—furfuryl alcohol, chlorine and water—and achieves a greater yield of maltol than prior processes utilizing the more expensive starting materials of kojic acid and a sugar derivative; and (2) it creates maltol in only two steps and in one pot, rather than four or more separate chemical transformations which require isolation of the intermediates (Pl.Ex. 36). As a "pioneer patent," Pfizer argues, its process is entitled to the broadest possible protection. *Id.*

■ Pfizer alleges infringement of Independent Claims 1 and 14, and dependent claims 3, 5, 8, 10 and 11 of its patent. It is fundamental patent law that if an independent claim is not infringed, none of the dependent claims are infringed.

Independent Claim 1 describes both steps of Pfizer's two-step process. The claim requires contacting a furfuryl alcohol in aqueous solution with a specified quantity of halogen oxidant, such as chlorine, at a temperature of −50 to 50 degrees centigrade, and heating the formed intermediate, 4–halo–dihydropyran, until hydrolysis is substantially completed and a gamma-pyrone, such as maltol, is produced (Pl.Ex. 40).

Independent Claim 14 sets forth Pfizer's process for the production of the gamma-pyrone pyromeconic acid (Pl.Ex. 40).

## III.

*PFIZER'S CASE*

Pfizer first obtained some information on Anhui's manufacturing process in December 1992, when Pfizer's director of business development, John F. McGowan, visited the

Anhui factory in China. McGowan testified that he had visited four other factories producing maltol in China for the purpose of exploring joint ventures, and that he had concluded from discussions with employees at those factories that their production processes were similar to Pfizer's patented process (Tr. 76–77, 81). McGowan further testified that he was told by one such factory that it used furfural as the starting compound, converted the furfural to furfuryl alcohol by what is known as the Grignard Reaction, then chlorinated and hydrolysed the resultant compound, much like the Pfizer process (Tr. 77–78).

■ However, when McGowan inquired about Anhui's process, Anhui's chief engineer, Yu Min Fan, was reluctant to disclose such information even under a confidentiality agreement (Tr. 85). Through questions posed to Fan, McGowan was able to ascertain some information which he recorded in handwritten notes: "Start with furfural—grignard to alcohol—said they chlorinate but would not disclose specifics. Would not return to issue of chlorination and hydrolysis when suggested ... Tanks were observed which appear to be chlorine storage" (Pl.Ex. 4).[1]

At trial, it was undisputed that a written inspection report by T.C. Shiau, a chemical engineer and patent agent in Taiwan retained by F & S to visit the Anhui factory to obtain information on its process, was the best and only version of the Anhui method available to the parties. The Shiau Report (Pl.Ex. 12 and Def.Ex. AF) contains Shiau's description of Anhui's process for producing maltol and ethyl maltol, as told to him by chief engineer Fan when he visited the factory in December 1993. Both Pfizer and F & S had to rely on the Shiau Report in presenting their cases. However, the admissibility and, more importantly, reliability of the Shiau Report is in serious doubt because it is based predominantly on the hearsay statements of Anhui's chief engineer Fan (the

---

1. Although McGowan's testimony as to statements made by Anhui personnel is hearsay, F & S stated pre-trial that it would not object to the hearsay (Tr. 11). In any event, the statements made on behalf of Anhui, which was a party to this suit and still is a de facto partner of F & S in the importation of maltol, constitute admissions under Rule 801(d)(2) of the Federal Rules of Evidence.

Report is replete with the phrase, "according to Mr. Fan") and states at least seven times that Mr. Fan "refused" to provide material information when asked.[2]

The process outlined in the Shiau Report begins with crude furfural, which is distilled to remove furfuryl alcohol and water (Shiau Report at 5). The purified furfural is treated with an oxidant identified by the report as "selenium oxide" and a solvent identified as tetrahydrofuran to form pyromeconic acid (Shiau Report at 4). To the pyromeconic acid are added chloromethane, piperidine, ethanol and formaldehyde, at which time the pyromeconic acid undergoes methylation and forms maltol (Shiau Report at 8).

Pfizer, through its expert Dr. Daniel Kemp, makes three points based on the Shiau Report: (1) it is doubtful that the process outlined by Fan is the actual Anhui process because it is "exceptionally unlikely" to produce maltol in commercial quantities; (2) if the Anhui process is indeed as described in the Shiau Report, in order to yield the quantities stated in the Shiau Report, "a substantial fraction" of the maltol must in fact be made by reactions covered by Pfizer's patent; and (3) it is "highly probable" that Anhui infringed the Pfizer patent (Tr. 132–133).

Dr. Kemp, a professor of chemistry at the Massachusetts Institute of Technology and a consultant to Pfizer since 1966, has been familiar with the maltol synthesis process described in the patent since its development stages in 1974 (Tr. 131). Dr. Kemp attacked the infringement issue on two fronts. First, taking the Shiau Report as an accurate description of Anhui's production method, Dr. Kemp presented his analysis of how the Anhui process worked and compared it to the Pfizer patent. He concluded that the Anhui process, as described, utilizes chemical pathways that are covered by the claims of Pfizer's patent and constitutes an infringement. Second, Dr. Kemp explained persuasively why, in his opinion, the Anhui process is not in fact as the Shiau Report describes, based on his beliefs about the improbability of some of the chemical reactions allegedly occurring.

## A. *Dr. Kemp's proposed mechanism of Anhui's process and conclusion that it infringes Pfizer's patent*

Dr. Kemp noted that the Shiau Report contained incomplete information and internal contradictions (Tr. 171–180). Notwithstanding its limitations, however, for the purpose of analysis Dr. Kemp assumed as true the information provided in the Shiau Report and drew up an outline of the chemical pathways by which Anhui purportedly produces maltol (Pl.Ex. 38 and 39). Dr. Kemp's "proposed mechanism" of Anhui's process is broken down to 10 reaction stages, or steps, ending with maltol. Essentially, the infringement occurs in steps 1 to 6 of the process, where the starting compound is oxidized with selenium dioxide to form pyromeconic acid. Pfizer contends that it is during these stages that the key claims of its patent are copied.

Dr. Kemp compared his proposed Anhui process to the Pfizer patent and expressed the opinion that the Anhui process infringes numerous claims of the Pfizer patent:

Independent Claim 1 describes contacting a furfuryl alcohol in aqueous solution with a specified quantity of halogen oxidant, such as chlorine, at a temperature of −50 to 50 degrees centigrade, and heating the formed intermediate, 4–halo–dihydropyran, until hydrolysis is substantially completed and a gamma pyrone, such as maltol, is produced (Pl.Ex. 40). Dr. Kemp testified that it was highly unlikely that crude furfural could be directly transformed into pyromeconic acid and that it was more likely that the furfural was first converted to furfuryl alcohol. By applying selenium dioxide as the oxidant, all of the conditions of Claim 1—including the presence of the three species that are key to the Pfizer process: alcohol, chlorine and water—are met by steps 1 through 5 of his proposed Anhui process (Pl.Ex. 38), leading him to conclude that the purported Anhui

---

**2.** Although the admissibility of the hearsay portion of the Shiau Report is highly doubtful, both parties rely on the hearsay information and the case cannot be decided without considering it. Also, as the proponent of the Shiau Report, F & S is estopped from challenging Pfizer's use of the Shiau Report.

process violates Independent Claim 1 of Pfizer's patent (Tr. 214–219).

Claim 3 describes the addition of a cosolvent, ethanol, which the Shiau Report indicates is likewise added in the Anhui process (Tr. 220).

Claim 5 notes the presence of an ether, tetrahydrofuran, which the Shiau Report states is introduced in the Anhui process (Tr. 220).

Claim 8 states that the halogen oxidant used is chlorine. Dr. Kemp testified that chlorine is generated in situ at steps 3 and 4 of his proposed mechanism of the Anhui process (Pl.Ex. 38) (Tr. 221).

Claims 10 and 11 describe, respectively, the chemical compositions of maltol and ethyl maltol, which are the end products of Anhui's process (Tr. 221).

Independent Claim 14 sets forth Pfizer's process for the production of pyromeconic acid, a compound formed at step 6 of Dr. Kemp's proposed mechanism of the Anhui process (Pl.Ex. 39) (Tr. 222).

As a result of this analysis, Dr. Kemp concluded that the Anhui process, as interpreted by him, infringes Pfizer's patent.

### B. *Dr. Kemp's opinion that the Shiau Report does not describe the process in fact used by Anhui*

In the second half of Dr. Kemp's testimony, he expressed the opinion that Anhui could not be producing maltol by the process described in the Shiau Report for three reasons. First, Dr. Kemp believes that it was "not probable" for furfural, oxidized with selenium dioxide, to yield significant amounts of pyromeconic acid (Tr. 231). He explained that furfural presents five sites of reaction when oxidized, leading to 60 potential reactions of which only one or two could, in fact, generate pyromeconic acid (Tr. 246). Second, he does not believe that any selenium compound would be used as the oxidant in a product that serves as a food additive because of selenium's toxicity and the difficulties attendant to the handling of selenium compounds and achieving complete removal of the poisonous ingredient (Tr. 257–263). Third, Dr. Kemp believes it would not be

commercially feasible to sell maltol if a key ingredient was selenium dioxide, a compound ten times more expensive than chlorine and less efficient as an oxidizing agent (Tr. 267, 355).

In sum, Dr. Kemp concluded that "it's highly probable that the Chinese, that is the Anhui group, have infringed the Pfizer patent" (Tr. 132–133).

### IV.

### F & S's REBUTTAL

At trial, F & S offered in evidence three declarations of Chen Guo Bao, Anhui's general manager, and two declarations of Anhui's chief engineer Fan ("Anhui declarations"), as well as certain Anhui factory production records that purportedly corroborate its position that the Anhui process does not infringe Pfizer's patent. F & S offered these documents to (1) explain the confidentiality agreement between the Anhui factory and the Anhui Chemical Research Institute which licenses the maltol technology; (2) contradict McGowan's deposition testimony that Anhui personnel discussed their process with him "in detail"; (3) confirm that the Anhui process is in fact the one outlined by F & S's expert, Dr. James S. Moore; and (4) explain the discrepancies between the Shiau Report and the Anhui factory production records.

■ F & S moved to admit the Anhui declarations under Rule 804(b)(5) of the Federal Rules of Evidence (Tr. 5), which sets forth two threshold requirements for admitting hearsay not covered by any of the enumerated hearsay exceptions: the declarant must be unavailable and the hearsay statement must have "circumstantial guarantees of trustworthiness." The Anhui declarations do not meet either requirement. First, Rule 804(a) states that a declarant is not "unavailable" if his absence is caused by the proponent of his hearsay statement. Since F & S joined the motion to dismiss the complaint as to Anhui, F & S is precluded from now arguing that Anhui's agents are "unavailable" within the meaning of Rule 804(a). Moreover, the Anhui declarations are clearly self serving and unreliable. On the one hand, Anhui maintains that it is bound by a confi-

dentiality agreement to keep its process secret; on the other hand, the declarations purport to confirm that the chemical process outlined by the F & S expert Dr. Moore *is* Anhui's process. F & S argues that the legislative history of § 295 indicates that declarations and business records of foreign manufacturers may be used to rebut any presumption of infringement (Tr. 519). However, because the Anhui declarations are altogether lacking in trustworthiness and because the legislative history does not indicate that the rules of evidence are to be suspended in a § 271 infringement case, the Anhui declarations constitute inadmissible hearsay.

The Anhui production records are also inadmissible for lack of proper authentication under Rule 901 of the Federal Rules of Evidence.

What remains of F & S's proof is the testimony of Shiau, his inspection report and the testimony of F & S's expert Dr. Moore.

Shiau testified that all of the key information regarding Anhui's process—that it starts with furfural (Tr. 413), forms pyromeconic acid in reaction vessel 2 (Tr. 415), oxidizes with selenium dioxide (Tr. 415–416), adds four reagents into vessel 3 (Tr. 417), and uses no chlorine to halogenate (Tr. 418)—was provided by chief engineer Fan.

Shiau's testimony established beyond doubt that Fan shepherded him through the factory and prevented him from verifying information:

Q. Did you ask Mr. Fan to produce or allow you to take samples of the intermediates for testing?

A. Yes, I asked him for some samples of the intermediate.

Q. What was his response?

A. He didn't want to give me any sample.

Q. Did he tell you why he did not want you to have any samples?

A. He told me that the analysis technology in the United States is very advanced so if they provided the intermediate samples the United States would know what exactly what the process will be.

(Tr. 412–413).

Q. Did you ask Mr. Fan what the temperature was of the material that was reacting in vessel number 2?

A. I didn't ask him but I observed the temperature on the thermometer to be between 80 to 90 degrees centigrade.

Q. What did Mr. Fan do when you attempted to read the temperature on the thermometer of reaction 2?

A. He didn't like the fact that I tried to have a look at the thermometer so he just urged me to go forward.

Q. For that reason you could not—you cannot tell us what the exact temperature that was actually taking place in that reaction vessel 2?

A. Yes, that's correct.

(Tr. 420).

Q. On line 24 of page 8, it states, "And some material is added to the methylation tank." Did you ask Mr. Fan what that material was?

A. Yes, I did ask him.

Q. What was Mr. Fan's response?

A. He didn't want to answer my question.

Q. Did he laugh at you when you asked that question?

A. Yes, he did.

(Tr. 421).

Notwithstanding the extreme unreliability of the information contained in the Shiau Report, it is the sole basis of Dr. Moore's opinion that the Anhui process does not infringe the Pfizer patent (Tr. 436). The difference of opinion between Dr. Moore and Dr. Kemp rests on a single dispute between the two experts—the chemical pathway by which Anhui purportedly goes from furfural to pyromeconic acid, with selenium oxide as the oxidant—a critical step in the production process which is unexplained in the Shiau Report and which Dr. Kemp contends constitutes the infringement.

In Dr. Kemp's opinion, it was highly unlikely that Anhui oxidized furfural with selenium dioxide to form pyromeconic acid because furfural presents five sites of reaction

when oxidized, leading to 60 potential reactions of which only one or two could, in fact, generate pyromeconic acid (Tr. 246, Pl.Ex. 46). Accordingly, Dr. Kemp hypothesized that Anhui more likely commenced its process by converting furfural to furfuryl alcohol (Pl.Ex. 38).

Dr. Moore was of the opinion that the mechanism set out by Dr. Kemp would not convert furfural to furfuryl alcohol or pyromeconic acid (Tr. 442). Dr. Moore also testified that there is a potential reaction which can transform furfural directly to pyromeconic acid with selenium dioxide as the oxidant, and assumes that to be Anhui's process (Def.Ex. N).

However, this difference between the experts is not decisive because each chemist is merely presenting his theory of how the process might proceed if selenium dioxide was used. In fact, there is no hard evidence that selenium dioxide was the actual oxidant used by Anhui. Indeed, Dr. Moore testified that in a telephone conversation with Anhui's chief engineer Fan, he understood Fan to indicate that the oxidant "was some other compound" other than selenium (Tr. 511). However, that understanding changed when, in another telephone conversation, Fan indicated that the oxidant was "primarily selenium oxide" (Tr. 512).

Moreover, Dr. Moore's testimony posits that it is possible to produce maltol in a manner consistent with the Shiau description and not infringe Pfizer's patent, without considering the probability of it actually occurring. I find Dr. Kemp's testimony more plausible because he takes into account the fact that numerous potential reactions could be produced by oxidizing furfural with selenium dioxide—and the effect that has on yield and cost—and concludes that while it might be possible, it is highly improbable.

## V.

■ In determining patent infringement, "resort must be had in the first instance to the words of the claim. If [the] accused matter falls clearly within the claim, infringement is made out and that is the end of it." *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950). However, under the doctrine of equivalents, a patentee need not prove literal infringement if the process is shown to perform "in substantially the same way, and accomplish substantially the same result." *Id.* at 608, 70 S.Ct. at 856.

■ As a threshold matter, the Pfizer patent is determined to be a "pioneer patent" deserving of the broadest protection. Dr. Kemp testified, without contradiction by Dr. Moore, that Pfizer's process for producing maltol represents "a unique, extraordinarily conceived process that takes cheap readily available starting materials under exceedingly simple laboratory conditions, and converts them into these exceptionally useful products" (Tr. 143). The significant feature of the Pfizer process is the development of a reaction chain that solves the problem engendered by the dynamic equilibrium of the reacting compounds—where the product formed by the starting material and an oxidizing agent is more vulnerable than the starting material and is itself oxidized and destroyed (Tr. 154). "[T]he solution provided by the Pfizer patent is that there is an intermediate formed rapidly" that serves as a "safe haven" before a slower conversion to pyromeconic acid (Tr. 156–157). Furthermore, this result is achieved by using some species of chlorine, the cheapest of oxidants (Tr. 161).

■ Through the testimony of McGowan and Dr. Kemp, Pfizer has established by a preponderance of the evidence that a substantial likelihood exists that Anhui's maltol was made by Pfizer's patented process. Dr. Kemp's proposed mechanism for the Anhui process based on the Shiau Report contains all the elements covered by the Independent Claims of Pfizer's patent and establishes, at the very least, infringement under the doctrine of equivalents, if not literal infringement.

From the discovery history of this case and the testimony of McGowan, Pfizer has also established that it made a reasonable effort to determine the process actually used by Anhui but was unable to do so. Accordingly, Pfizer has fulfilled its burden under 35 U.S.C. § 295 and Anhui's process is pre-

sumed to infringe Pfizer's patent. The burden shifts to F & S to prove that it does not infringe.

■ To rebut the presumption of infringement, F & S must establish that (1) the Shiau Report is an accurate statement of the Anhui process and (2) Dr. Moore's opinion is more convincing than Dr. Kemp's. F & S has failed to establish either proposition.

As to the first, the limitations of Shiau's testimony and his inspection report are apparent. Unfortunately for F & S, its proof depended entirely on Anhui's willingness to disclose the actual process. Despite urging by F & S and the fact that all materials in this case were filed under protective order, Anhui steadfastly refused to divulge the precise method by which it produced maltol, citing a confidentiality agreement it entered with the Anhui Chemical Research Institute. Anhui's failure to disclose has precluded F & S from mounting a credible and effective defense, a fact acknowledged by F & S in its internal memoranda and in communications to Anhui. *See* Pl.Ex. 65, letter of F & S Asian Branch manager, John T. Engel, to Anhui ("According to U.S. law, the responsibility is on the importers (like F & S) and Chinese manufacturers to prove that no violation has taken place"); and Pl.Ex. 70, memorandum of F & S's general manager of chemicals Stanley D. Janow to Engel ("we can't move further without letter from Hefei stating in detail their process. If they don't supply information previously requested, then we might have to drop out of the business completely as, without their support, we have no case").

As to the second, because Dr. Moore's testimony is predicated on the assumption that the Shiau Report is a dependable statement of the Anhui process, its value is altogether undermined. Dr. Moore's testimony differs from that of Pfizer's expert Dr. Kemp in one major respect—Dr. Moore believes that it is technically feasible to produce maltol as described in the Shiau Report and via a chemical pathway that would not infringe Pfizer's patent, whereas Dr. Kemp believes it to be improbable. Even assuming Dr. Moore's opinion that Anhui could have produced maltol as it suggests it does without

infringing Pfizer's patent, I find Dr. Kemp's analysis more persuasive because it takes into account the factors of cost and yield to reflect the improbability of Anhui's actually producing maltol by a non-infringing process.

As a last resort, F & S argues that even if Pfizer has proven that Anhui makes pyromeconic acid according to the Pfizer patent (Dr. Kemp's proposed mechanism steps 1 to 6), there is no liability because Pfizer is suing for infringement of maltol, a substance materially different from pyromeconic acid.

F & S refers to 35 U.S.C. § 271(g), which states that "[a] product which is made by a patented process, will, for purposes of this title, not be considered to be so made after ... it is materially changed by subsequent processes," and contends that the alkylation of pyromeconic acid to maltol and ethyl maltol constitutes a material change under the statute. This argument is specious. Pfizer's patent covers a process for the preparation of gamma-pyrones. Pyromeconic acid is a specie of gamma-pyrone. Alkylation in this case refers to the addition of a methyl or ethyl group to the pyromeconic acid—a common reaction well known to organic chemists—and does not, in the words of F & S's own expert Dr. Moore, change "the basic gamma-pyrone structure of this compound" (Tr. 501).

In sum, F & S's proof falls short of overcoming the presumption of infringement that Pfizer has established.

\*　　\*　　\*

This memorandum of decision contains the findings of fact and conclusions of law required by Rule 52(a) of the Federal Rules of Civil Procedure.

Pfizer is entitled to the relief requested in the Complaint. Submit proposed judgment and decree on notice.