EMERGENCY FUEL, LLC, et al.,

v.

PENNZOIL–QUAKER STATE CO.

No. CIV. CCB–00–CV–156.

United States District Court,
D. Maryland.

March 7, 2002.

James Elwood Armstrong, IV, Law Office, Charles H. Hill, deKieffer and Horgan, Scott M. Daniels, Armstrong Westerman Hattori McLeland and Naughton LLP, Washington, DC, for Plaintiffs.

Joel M. Freed, Michael C. Augustini, Scott Chambers, Gillian C. Wood, Andrew S. Brenc, Arnold and Porter, Washington, DC, Gerald P. Martin, Martin Snyder and Bernstein PA, Baltimore, MD, David Andrew Super, Baker Botts LLP, Washington, DC, Michael Wilson, Carey Jordan Heatherington, Baker Botts, LLP PH, Houston, TX, for Defendant.

## MEMORANDUM

BLAKE, District Judge.

Now pending before this Court is a motion by Defendant, Pennzoil–Quaker State Co. ("Pennzoil"), for summary judgment on all counts of the complaint in this patent case. Plaintiffs, Emergency Fuel, LLC, Spare Tank, LLC, William Hubbard, Reginald Spencer, and Leonard Bloom filed suit alleging that Pennzoil's "Rescue" product infringes four patents held by the plaintiffs covering an emergency fuel called "Spare Tank." The motions have been fully briefed and oral argument was held on January 18, 2002. For the reasons that follow, the court will grant the defendant's motion.

### I.

The plaintiffs own four patents that, in general terms, cover an emergency fuel

that provides for the clean and smooth operation of an internal combustion engine, that is able to be stored in a vehicle for a long period, and is to be used when the vehicle is out of fuel. The four patents are United States patent 5,681,358 (" '358"), United States patent 5,938,799 (" '799"), United States patent 6,110,237 (" '237"), and United States patent 6,113,660 (" '660"). With some variations, each patent covers a fuel that: (1) is comprised essentially of mineral spirits; (2) has a flash point of at least 100° F; (3) has an octane in a range that will allow an engine to run smoothly and will allow clean and smooth operation of an engine; (4) can be stored safely in a vehicle for at least twelve months; (5) can be poured into a gas tank or used in an empty gas tank; (6) has no butanes or pentanes; and (7) has a paraffin fraction of 9–12 carbon atoms and an aromatic hydrocarbon fraction of 9–12 carbon atoms. Hubbard and Spencer invented the emergency fuel and applied for the various patents with the help of attorney Bloom. Hubbard, Spencer, and Bloom later joined with Spare Tank, LLC, and Emergency Fuel, LLC, to produce the emergency fuel for sale to the public.

The chronology of patent applications filed by the plaintiffs is as follows: On September 29, 1995, application 08/536,366, which was later abandoned, was filed. On February 20, 1996, a continuation-in-part ("CIP")[1] application was filed. This application became the '358 patent. On October 22, 1997, another CIP application was filed. This application became the 5,853,433 patent, which is not alleged to be infringed in this case. On May 20, 1998, a third CIP application was filed. This became the '799 patent. On April 21, 1999, a

fourth CIP application was filed, which became the '237 patent. Finally, on July 29, 1999, a fifth CIP application was filed, which became the '660 patent. The '358, '799, '237, and '660 patents all are at issue in this case.

## II.

Rule 56(c) of the Federal Rules of Civil Procedure provides that:

> [Summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Apple Computer, Inc. v. Articulate Sys., Inc.,* 234 F.3d 14, 20 (Fed.Cir.2000). In making this determination, the evidence of the party opposing summary judgment is to be believed and all justifiable inferences drawn in her favor. *Apple Computer,* 234 F.3d at 20 (*citing Anderson,* 477 U.S. at 255, 106 S.Ct. 2505). The non-moving party may not rest upon mere allegations or denials in her pleading, however, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Spectra Corp. v. Lutz,* 839 F.2d 1579, 1581 (Fed.Cir. 1988). The "mere existence of a scintilla of evidence in support of the plaintiff's position" is not enough to defeat a defen-

---

1. "A 'CIP' application is a continuing application containing a portion or all of the disclosure of an earlier application together with added matter not present in that earlier appli-

cation." *Transco Prods., Inc., v. Performance Contracting, Inc.,* 38 F.3d 551, 555 (Fed.Cir. 1994).

dant's summary judgment motion. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

### III.

Pennzoil seeks summary judgment (or partial summary judgment) on five grounds: (1) that the asserted claims of the '799 and '358 patents are invalid for failing to claim what the applicants regard as their invention; (2) that all of the patents are invalid due to prior art; (3) that the asserted claims of the '237 and '660 patents are invalid by reason of public use and violation of the on sale bar; (4) that the asserted claims of the '358 and '799 patents are invalid for lack of enablement; and (5) that all of the patents are invalid due to inequitable conduct of the applicants.[2] For the reasons that follow, the court will grant summary judgment on the third and fourth grounds.

### A.

Pennzoil asserts that the '237 and '660 patents are invalid by reason of public use and violation of the on sale bar. A party is prohibited from obtaining a patent for an invention that was in public use or on sale more than one year before the effective filing date for the patent on that invention. 35 U.S.C. § 102(b). The '237 and '660 patents are "continuing" applications in a series of applications, and the plaintiffs argue that both patents may claim the benefit of the earlier effective filing dates of the older applications, '799 and '358. Pennzoil concedes that if the '237 and '660 patents receive the benefit of the earlier filing dates, its invalidity argument fails.

■ In order to receive the benefit of an earlier filing date, an application must satisfy the requirements of 35 U.S.C. § 120. That statute provides "that a patent application is entitled to the benefit of the filing date of an earlier filed application only if the disclosure of the earlier application provides support for the claims of the later application, as required by 35 U.S.C. § 112." *In re Chu*, 66 F.3d 292, 297 (Fed.Cir.1995). The first paragraph of 35 U.S.C. § 112 states in relevant part that:

> [t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same. . . .

*Id.* The burden is on the defendant Pennzoil to establish that the '237 and '660 patents are not entitled to the earlier filing dates of the '358 and '799 patents. *See State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1233 (Fed.Cir.1985) (holding that where there is a challenge under the on sale bar of § 102(b), the defendant must show "that the newly added matter in the C–I–P application was not adequately disclosed in the earlier application in the manner required by the first paragraph of § 112").

■ Plaintiffs assert that Pennzoil infringes all of the claims of the '237 and '660 patents. The claims of the '237 and '660 patents include a fuel with an octane that is "about 86 to about 88," ('237 patent, claims 5, 10, Def. Ex. 1; '660 patent, claims 4, 5, 9, 10, Def. Ex. 2), "86 to premium grade," ('237 patent, claims 1, 2, 6, 7, Def. Ex. 1; '660 patent, claims 1, 2, 3, 6, 7, 8, Def. Ex. 2) the same as that of "regular to

---

**2.** Pennzoil filed one motion for summary judgment but supported the motion with five separate memoranda. The plaintiffs accordingly filed separate oppositions. References to exhibit numbers will correspond to the exhibits attached to the memoranda related to the particular argument under discussion.

premium grade gasoline," ('237 patent, claims 11, 12, Def. Ex. 1; '660 patent, claims 11, 12, Def. Ex. 2) or which allows for the "smooth operation" of an internal combustion engine. ('237 patent, claims 3, 4, 8, 9, 13, Def. Ex. 1; '660 patent, claim 13, Def. Ex. 2.) It is undisputed that an octane number the same as that of regular to premium grade gasoline is at least 86. Additionally, for a fuel to allow for the "smooth operation" of an internal combustion engine, the octane number must be at least 86. (*See* Hubbard Feb. 2001 Dep. at 60–61, Def. Ex. 5 (stating that "if you're not in that range [86 to 88], then you're— you're probably going to have a running problem"); '358 patent at col. 5:56–58, Def. Ex. 6 ("In order to run smoothly, the fuel must have an octane number in the same range as or higher than regular gasoline. This is typically from 86–88."))[3] Since all the claims of the '237 and '660 patents require an octane number in the 86 to 88 range, Pennzoil must establish that the earlier patents do not enable a person skilled in the art to make or use an emergency fuel with an octane number of at least 86.

Pennzoil meets this burden by presenting the testimony of one inventor of the patents, Hubbard, who testified that the first applications that taught how to achieve the 86 to 88 octane level were the '237 and '660 patents. (Hubbard Feb. 2001 Dep at 151, Def. Ex. 5.) In response

to this concession, the plaintiffs contend that one skilled in the art would understand how to reach an octane number of 86. Their argument, however, is not persuasive. Plaintiffs cite the '358 patent, which states that the octane number can be increased by the presence of "naphthenes, aromatics and isoparaffins." ('358 patent at col. 5:62–64, Def. Ex. 6.) Plaintiffs also cite the '799 patent, which points out that an increase in aromatic content will increase the octane number. ('799 patent at col. 12:20–28, Def. Ex. 3). The same portion of the '799 patent, however, further explains that aromatic content should be limited because it increases black exhaust and odor. (*Id.* at col. 12:30–32.) Additionally, the '358 and '799 patents warn that high amounts of aromatics will cause engine damage and unclean operation. ('358 patent at col. 6:27–28, Def. Ex. 6; '799 patent at col. 6:29–31, Def. Ex. 3.) Both the '358 and '799 patents actually taught not to increase aromatic content, as required by the '237 and '660 patents. Thus, the defendant has met its burden of establishing that the '358 and '799 patents do not enable a person skilled in the art to make or use an emergency fuel with an octane number of at least 86. Accordingly, the '237 and '660 patents do not receive the benefit of the earlier filing dates.

Pennzoil must still establish that the invention was in public use or on sale more than one year before April 21, 1999. 35

---

**3.** Plaintiffs argue that this statement in the '358 patent, suggesting that an octane number of 86 to 88 is necessary for an engine to run smoothly, was an error. Plaintiffs point to the '799 application, which followed the '358 patent, and states: "The minimum octane number should be in the range of 65 to 75. However, it is preferred that the octane number be 90 or greater to be comparable to premium grade gasoline." ('799 patent at col. 5:46–49, Def. Ex. 3.) Patents '237 and '660 include the same statement. (*See* '237 patent at col. 6:3–6, Def. Ex. 1; '660 patent at col.

6:35–38, Def. Ex. 2.) The '358 patent, however, was incorporated in its entirety into the later patents. Additionally, even if the court accepts that this statement was an error, in light of Hubbard's testimony and the fact that every other claim explicitly requires an octane of at least 86, it is clear the plaintiffs were calling for an octane number in the 86 to 88 range. (*See* Hubbard Feb. 2001 Dep. at 153, Def. Ex. 5 (quoting the '358 patent's requirement that the octane number must be in the 86 to 88 range)).

U.S.C. § 102(b).[4] The product that is alleged to have been in public use or on sale more than one year before April 21, 1999 is a product called Spare Tank. The Spare Tank product is covered by the patents at issue in this suit and meets the requirement that it has an octane level of premium grade gasoline (over 86). (*See* Spare Tank Advertisement, Def. Ex. 10 (stating that Spare Tank falls under patent '358); Saybolt Test Result Letter, Def. Ex. 12.)

■ First, Pennzoil alleges that the inventors offered to sell the product to QVC and the Home Shopping Network in 1997. Pennzoil includes a letter dated July 10, 1997 from Spencer offering the product to QVC, a letter dated July 10, 1997 from Spencer offering the product to the Home Shopping Network, and a letter dated August 7, 1998 from the Home Shopping Network to Hubbard rejecting the offer. (*See* Spencer Letter to QVC, Def. Ex.13; Spencer Letter to Home Shopping Network, Def. Reply Ex. 2; Home Shopping Network Letter to Hubbard, Def. Ex. 14.) Although the offers did not result in sales, "[a] single offer to sell is enough to bar patentability whether or not the offer is accepted." *A.B. Chance Co. v. RTE Corp.*, 854 F.2d 1307, 1311 (Fed.Cir.1988); *see also Pfaff v. Wells Elecs., Inc.*, 124 F.3d 1429, 1436 (Fed.Cir.1997), *aff'd*, 525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998) ("The on-sale bar is not limited solely to a sale of, *or an offer to sell*, a product that anticipates the later patented invention. It also applies if 'the subject matter of the sale *or offer to sell* ... would have rendered the claimed invention obvious by its addition to the prior art.' ") (citation omitted) (emphasis added). In making the determination whether the invention was on sale, "all of the circumstances surrounding the sale or offer to sell, including the stage of development of the invention and the nature of the invention, must be considered and weighed against the policies underlying section 102(b)." *Id.* at 1433 (citation omitted).

Plaintiffs argue that the proposals to QVC and the Home Shopping Network were consignment arrangements and do not constitute an offer in accordance with the Uniform Commercial Code. *See Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1047 (Fed.Cir.2001) ("As a general proposition, we will look to the Uniform Commercial Code ("UCC") to define whether, as in this case, a communication or series of communications rises to the level of a commercial offer for sale."). Plaintiffs suggest that the communications with QVC and the Home Shopping Network were mere advertising and promoting of a product.

■ Language such as "I offer" or "I promise" must be considered, however, as well as the presence of specific terms such as price and quantity. *Id.* at 1048. In the 1997 letters, Spencer states that "we are offering." The letter to QVC also states a wholesale price, a quantity they will supply, a manufacturer's suggested resale price, a product availability date of two to three weeks, a payment term, and a shipping date. (*See* Spencer Letter to QVC, Def. Reply Ex. 1, at 2.) These terms make clear that the communications constituted offers. Further, Hubbard testified that these were offers for sale. (Hubbard May 2001 Dep. at 169–72, Def. Ex. 7.) Finally, "the mere fact that a sale is made conditional upon the subjective satisfaction of the buyer or that the item is shipped *on a consignment basis*, does not automatically remove the transaction from either a sale or 'on sale' within the meaning of section 102(b)." *Gen. Elec. Co. v. United States*, 228 Ct.Cl. 192, 654 F.2d 55, 59–60 (1981)

---

4. The '237 patent was filed on April 21, 1999. The '660 patent was filed on July 29, 1999.

(emphasis added). Thus, there is no genuine dispute that the Spare Tank product was offered for sale to QVC and the Home Shopping Network more than one year before April 21, 1999.

■ Second, Pennzoil alleges that the Spare Tank product was publicly used more than one year before April 21, 1999. "If an inventor ... gives or sells [the invention] to another, to be used by the donee or vendee, without limitation or restriction, or injunction of secrecy, and it is so used, such use is public, even though the use and knowledge of the use may be confined to one person." *Egbert v. Lippmann,* 104 U.S. 333, 336, 14 Otto 333, 26 L.Ed. 755 (1881). On May 5, 1997, Hubbard signed a non-confidentiality waiver relating to Spare Tank emergency fuel with Exxon. (*See* Confidentiality Waiver, Def. Ex. 15 at PEN 0004.) The waiver indicates that Exxon could "freely use and disclose" Hubbard's idea "without accounting" to Hubbard. (*Id.*) Milton Fick, an Exxon employee, testified that Hubbard provided Exxon with a sample of Spare Tank. (Fick Dep. at 12–13, Def. Ex. 16.) Fick also sent a letter to Hubbard in October 1997 explaining that he was in possession of a sample of the plaintiffs' product and offering to return the sample to Hubbard. (*See* Letter from Fick to Hubbard, Def. Ex. 15 at PEN 0002.) Fick testified that he took the sample home in 1997 and used it in a lawnmower engine at his home. (Fick Dep. at 17–18, Def. Ex. 16.) Therefore, the plaintiffs' product was in public use more than one year before April 21, 1999.[5]

Overall, the '237 and '660 patents are invalid by reason of public use and viola-

tion of the on sale bar. 35 U.S.C. § 102(b). The patented products were in public use and on sale more than one year before the effective filing date for the patent on that invention. Accordingly, summary judgment will be granted on all claims under the '237 and '660 patents.

### B.

■ Pennzoil next argues that the asserted claims of the '358 and '799 patents should be invalidated because the patents do not enable one skilled in the art to obtain the stated octane number. The enablement requirement requires that a patent adequately teach how to make and use the invention as claimed. 35 U.S.C. § 112. The burden of proof is on the accused infringer to present clear and convincing evidence that the patent claims are invalid under 35 U.S.C. § 112. *See United States v. Telectronics, Inc.,* 857 F.2d 778, 785 (Fed.Cir.1988).

Pennzoil is alleged to have infringed claim 1 of patent '358, which claims:

A method of using a stable emergency fuel in an internal combustion engine of a vehicle comprising the steps of:

providing a container having mineral spirits therein, the mineral spirits having a flash point of at least 100° F. or higher,

safely storing the container with the emergency fuel in the vehicle for a period of at least twelve months unless needed for use prior thereto, and

pouring the mineral spirits into a fuel tank of the vehicle in the event the vehicle runs out of fuel, the emergency fuel providing clean and smooth

---

**5.** The plaintiffs claim there is inconclusive evidence that a sample was ever sent to Exxon because Hubbard does not recall sending a sample and testified that a sample only would have been sent if there was a confidentiality agreement. This argument fails because of Fick's testimony that he received and used a sample, which is corroborated by the documentary evidence.

operation of the internal combustion engine.

('358 patent at col. 10:53–65, Def. Ex. 1.) The '358 patent states that the emergency fuel "must have an octane number in the same range as or higher than regular gasoline" for an engine to run smoothly. (*Id.* at col. 5:57–58.) This is "typically from 86 to 88." (*Id.*)

■ Pennzoil presents evidence that the '358 patent does not teach one with ordinary skill in the art to make an emergency fuel with the required octane number of 86 to 88. Pennzoil cites Hubbard's testimony that there was no evidence any of the examples of emergency fuels discussed in the '358 patent would give an octane number of 86 to 88. (Hubbard Feb. 2001 Dep. at 69–71, Def. Ex. 2.) Hubbard also testified that the first patents that taught how to achieve an octane number of 86 were the '237 and '660 patents. (*Id.* at 151.) He agreed that the fuel described in example 1 of the '358 patent had an octane number closer to 40. (*Id.* at 61–62.) Richard Bechtold, the plaintiffs' expert witness, agreed that the fuel had an octane number significantly lower than 86. (Bechtold Dep. at 146–47, Def. Ex. 3.)

Plaintiffs argue that the '358 patent disclosed the known method for increasing octane number—by adding "naphthenes, aromatics and isoparaffins," that the 86 to 88 number in the '358 patent was an error, and that it was well known how to increase octane number when the patent was issued. In fact, the '358 patent actually taught against using large amounts of aromatic hydrocarbons, while the more recent patents teach that to fulfill the smooth and clean engine operation requirement, one must increase aromatic content. Thus, the error in patent '358 is fatal because the '358 patent does not teach the full scope of the claimed invention, specifically, how to obtain an octane number of 86, as required by section 112. *See Genentech, Inc. v. Novo Nordisk A/S,* 108 F.3d 1361, 1365 (Fed.Cir.1997) ("To be enabling, the specification of a patent must teach those skilled in the art how to make and use the *full scope* of the claimed invention without 'undue experimentation.' ") (citation omitted) (emphasis added).

Pennzoil is alleged to have infringed claim 4 of patent '799, which claims:

> An emergency fuel for an internal combustion engine to be stored in a vehicle and to be used when the vehicle is out of fuel, the emergency fuel comprising:
>
> > mineral spirits,
> >
> > the emergency fuel having an octane number of at least 70, and
> >
> > the emergency fuel having a flash point of at least 100° F.

('799 patent at col. 13:1–7, Def. Ex. 6.) Pennzoil presents sufficient evidence that the '799 patent does not teach one with ordinary skill in the art to make an emergency fuel with the required octane rating of at least 70. The '799 patent makes it appear that the blends described in Examples XII and XIII would achieve the octane number of 70, but the octane numbers for those blends are actually lower than 70. (Hubbard Feb. 2001 Dep. at 108–112, Def. Ex. 2; *see also* Bechtold Dep. at 151, Def. Ex. 3 (stating that the '799 patent did not adequately teach how to make an emergency fuel with an octane of at least 70)). Additionally, the '799 patent also taught not to increase aromatic content, but incorporated by reference the entire '358 patent, including the reference to an octane number of 86 to 88. Therefore, the '799 patent does not satisfy the requirements of section 112.

Finally, the plaintiffs argue that any error is not significant. In *PPG Indus., Inc. v. Guardian Indus. Corp.,* 75 F.3d 1558 (Fed.Cir.1996), the court found no violation

of the enablement requirement despite the inventors' error in calculating the ultraviolet transmittance level of the claimed glass. *Id.* at 1564. "[In] order to be enabling, a specification must teach those skilled in the art how to make and use the full scope of the claimed invention *without undue experimentation.*" *Id.* (emphasis added) (citation omitted). Relying on the district court's finding that the error was "harmless, inconsequential, and easily detectable by anyone who was skilled in the art of processing solar controlled glass," the court found that the PPG error could be discovered without "undue experimentation." *Id.* The court discussed examples in the patent and concluded that "[i]n preparing that embodiment, the experimenter would discover that the ultraviolet transmittance calculations for the examples found in the patent specification are a few percent too high, but that error would not affect the experimenter's ability to make the desired embodiment." *Id.* at 1565.

In this case, as Pennzoil argues, if one skilled in the art does what the patents teach, he or she would not be able to attain compositions that fall within the asserted claims without undue experimentation, because the patents specifically teach not to increase aromatic content. Thus, the '358 and '799 patents fail to meet the enablement requirement. Accordingly, summary judgment will be granted in favor of the defendant on the claims asserted under the '358 and '799 patents.

Because summary judgment will be granted as to all patent claims asserted by the plaintiffs, it is unnecessary to reach the defendant's remaining arguments for summary judgment.[6] It is also unneces-

sary for the court to address the plaintiffs' renewed motion for summary judgment for literal infringement, plaintiffs' motion to compel deposition testimony of James Postl, plaintiffs' motion to compel Rule 30(b)(6) testimony, or Pennzoil's motion to review plaintiffs' responses to requests for admission. The motions to seal, however, will be granted, as the papers include confidential commercial information and public disclosure could unfairly damage the parties' business and financial interests.

A separate order follows.

### *ORDER*

For the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that:

1. The motions to seal (docket numbers 55, 57, 72, 73, 81, and 83) are **Granted;**

2. The discovery motions (docket numbers 56, 79, and 97) are **Denied as moot;**

3. The plaintiffs' renewed motion for summary judgment (docket number 74) is **Denied as moot;**

4. The defendant's motion for summary judgment (docket number 66) is **Granted in part** as set forth in the Memorandum; and

5. The Clerk shall send copies of this Order and the accompanying Memorandum to counsel of record.

---

6. It does appear doubtful to the court that a 1943 patent covering aviation fuel anticipated or made obvious the automobile emergency fuel at issue in this case. Additionally, *Solomon v. Kimberly–Clark Corp.*, 216 F.3d 1372 (Fed.Cir.2000), strongly suggests that Hub-

bard's declaration and deposition testimony cannot be considered in determining whether an issued patent claim satisfies the "regards as his invention" requirement of 35 U.S.C. § 112. *Id.* at 1377–80.